May it please the court, I am Paul Boas, and I am privileged to represent Thomas Throckmorton in this case. I'd like to reserve two minutes for rebuttal, and every question will be granted. Thank you. Let me begin by saying I presented, contrary to the teachings of Judge Alicert, five issues in this brief, and I think they're all strong issues. Clearly, I'm not going to be able to talk about all five of them, but I'm just reminding the court that if I don't get to some of them, that's no concession that they're not meritorious issues and have strength. Let me begin with the first issue. This is the lesser-included offense issue. In this case, the defendant was charged with possession with intent to distribute in excess of 100 kilograms of marijuana, and our defense of trial was really twofold. One, that the two accomplices, Robert and George Gailey, and Robert Gailey had transported all this marijuana on multiple occasions from Arizona to Pittsburgh in a secret compartment that he had built in a truck that he had formerly owned that was currently in the name of my client's company, that he was responsible for all of this, and he was just, he and his brother, and he was just putting it on Thomas Throckmorton. Alternatively, our second defense was Throckmorton, to the extent he may have been involved, possessed with intent to distribute less than 100 kilograms, and when it came time to instruct the jury, and I made a request that the court instruct on the lesser-included offense of possession with intent to distribute an unspecified amount of marijuana, and this circuit in U.S. v. Lacey has clearly held that that's a lesser-included offense of possession with intent to distribute in excess of 100 kilograms. The judge debated the issue, and the judge said, and it's noted in the record, well, I can see where a jury could find that. They could have felt that this was a split deal, that the Gaileys had some of it, and in fact, all it would have taken was for them to have 10 pounds on their own of this 230-pound shipment for Throckmorton to have less than 100 kilograms. It could be that way, but he said to the U.S. attorney on the case, well, what's your position? And he said, we want all or nothing, Your Honor. And it was on that, it was clear to me, and it's clear from the record, that it was on that basis, not that there was no possible way of finding that Throckmorton was into it, but for less than 100 kilos, that the court denied the instruction on the lesser-included. Well, I suppose you can clarify and refer to the evidence that you say is in the record that would support an inference that there was some agreement to split this. Right. Well, not necessarily that there was an agreement to split, but that there was a possibility of a split, and that's as follows. The government sought to introduce at least two prior deals where Robert Getty, and they said it because it was all part of the same offense. That's what the government argued, and ultimately the court agreed that on two prior occasions, months before, Galey had gone to Arizona and brought back 200 pounds on one occasion, 100 on another occasion. In each of those, Galey admits to selling himself large quantities of it. 10 pounds he took to Boston, 20 pounds he sold to some friends. Now, on the cross, he said, well, I did it for Throckmorton, but that was clearly a challenge. So we see a pattern of each time he brings drugs back, he is selling some on his own. We have testimony that George Galey, shortly before this, was selling drugs on his own, although he denied it. Okay, well, you were going to tell me, I thought, what the evidence was that would permit somebody to draw an inference that on this occasion, there was some anticipation or agreement that it would split between the two. Okay, I don't necessarily think I have to, with all due respect, prove that there was an agreement. All I have to prove is that a jury could possibly find that Robert Galey may have planned to take 10 pounds of it for himself, and what we have is that on two Wait a minute, though. The crime here is, is it not, is possession with intent to distribute. To distribute, and if at the time, at some time, when it was charged in the indictment, Throckmorton had possession of the whole thing with intent to distribute, it doesn't matter that there might be some possibility later on that they would split it up or whatever. That's correct. The question is whether there's evidence that would support that he didn't have possession of all of this at some point in time within the scope of indictment. Well, one, he never had possession of it, period. He never had actual possession. What happened was, didn't he accept delivery of the truck? The truck was parked in his driveway. There was never a time during this entire case where on the record he's told the quantity. There's even a meeting that's wired where Robert and George are there talking to Throckmorton, and they never mention the quantity. All that happens is Robert Daley calls Throckmorton and says, the truck's broken down. And Throckmorton says, well, drop her off at my house. And conveniently, the government loses that tape. But in any event, the truck is dropped off at Throckmorton's driveway. Throckmorton's in work. He leaves work. He has a beer. He has a sandwich. He drives home. He parks at his house. And as he's getting out of his car, he's arrested. He's never accepted delivery. He's never acknowledged the quantity. He's never seen the marijuana. It's in this hidden compartment. Now that led me to argue, you should find the monocular of everything. But the secondary argument is, there's no evidence that he knew exactly what the quantity was. And in each one of these other deals, Daley was out there selling marijuana. And the fact that Daley said, yeah, that's true. I was selling large quantities, but I was doing it for Throckmorton. The jury is free to agree with some or none of the witness's testimony. And all they had to do was say, we see a pedometer. We see that every time Daley goes to Arizona and brings back marijuana, he's out there selling some. And we choose to believe not that he's selling it for Throckmorton. We believe that he went and got it. We believe that he was selling some. He couldn't do it on his own. The fact that there's no discussion of the quantity, the fact that Throckmorton is arrested prematurely, the fact that George Daley, despite his denials, is also selling marijuana. All of these things suggest the fact that it was Daley who packed it. There were testimonies that on the load immediately prior to this, that Daley's unloaded it without Throckmorton being there. Now, I'm not suggesting the evidence suggests Ableton is overwhelming. It isn't. But the law is that if there's any evidence, no matter how weak, from which a rational jury could acquit of the greater and convict of the lesser, even if the standard is abuse of discretion, and it really isn't, it would be plenary because the judge agreed that there was evidence that support this. He just said, I'm not going to give it because the government wants all or nothing. Mr. Bowes, let me help you on the time standpoint. Why don't you address the confrontation issue, the cross-examination issue? Okay. As your time is beginning to run. I think the first issue is... All right, why don't you move to the confrontation issue? Robert Daley gets up and testifies. Now, at the time, Robert Daley had not been indicted. He had not been charged. According to him, no formal deal had been made. But this was a large quantity of marijuana that carried a five-year mandatory. I'm cross-examining Mr. Daley. He, in another case, had snitched out his uncle and not gone to jail. And I'm saying, you know about being an informant, about cooperating with the government. And he's dodging all the questions, but I can't question him about a plea agreement because there isn't one. And under the Third Circuit case, the one time when there's some discretion in not letting me ask about what he's doing. So I'm saying, isn't it true that you know you're facing five years? And the government of Jackson says, Boaz is just trying to get the jury to be aware of what Throckmorton's facing. Well, that's not true. This circuit in Chandler has said, even though it's not necessarily a great thing for the jury to know what a defendant is facing, that his rights under Van Arsdale to cross-examine give him the right to ask about this, even if the jury can infer. In Chandler, we said that the evidence that the district court kept out had to leave the jury with a significantly different impression of the witness's credibility. And of course that would be the case. How would that have left a significantly different impression in light of the fact that he testified that he had no agreement? Because he testified that in a prior case, he got out from under and got probation by testifying against his uncle. He testified that he was told he was going to be indicted here and he was planning to go to jail. He admitted hundreds of pounds of prior deals and related deals of this guy who knows how to get out from under by cooperating, is facing five years as a mandatory minimum and can avoid that by testifying. Yeah, but whatever he's facing, he's testified he has no deal. He's hopeful that his testimony is going to help his brother, but he has no deal. So whatever he faces, all the jury's going to know is it's likely that that's what he's going to get. Well, that's not exactly true, Your Honor, because all of the government witnesses said, this is a total lie. There was never a deal that his brother wouldn't be helped. That was never part of the deal. And he admitted, the fact is this guy is a liar and he's not a real good person and he's clearly indicating that he's in the past, figured out ways to help himself. And to say that because he denies the deal, that suggests that this wasn't an area that would cause the jury to have a different view of him. I look at it exactly the opposite, Judge Fischer. Here's a guy who I can't say, isn't it true that you have a deal in place where he'll get a 5k? All I get to say is, you know that this quantity carries a five-year mandatory, and you're aware that cooperating can get you out from under that. And the jury, of course, would have a different view of him if they learned, oh, I see what this guy's up to now. I see why he's pretty good on Throckmorton. He's trying to avoid five years. He's lying about trying to help his brother. Three different witnesses said there was never a deal. Nothing was ever said about helping his brother. So the jury sees the guy's lying about what he claims is his motivation. We know in the past he snitched his way out of jail time. And here's a guy who's not only facing the possibility of some time, he's facing a mandatory five years. And I'm not allowed to ask about it because of the erroneous conclusion that the jury could figure out that that's what Throckmorton's facing. That's not what the court said in January. It said the opposite. And with all due respect, I think the lack of a plea bargain, and we discussed this in the brief, is exactly why this is a case unlike Mousser where there might be some other avenue across examination. Simply to say you're hoping to do better for yourself, you're hoping that this helps a little, doesn't do it. The jury's entitled to know how much time this guy's looking at. Isn't it, Mr. Boaz, a fair characterization of the record that you were able to impeach his credibility because he had a self-interested motive as a cooperating witness, but you simply weren't allowed to reference the five years. Isn't that a fair characterization? Well, it's fair that I was able to say, you're involved in this case and you hope you're going to get something out of it. But he kept trying to dodge. The problem is his lies made that area of cross-examination ineffective and it became necessary. But what's so magic about the five years? If you're able to go through the entire line of questioning that we see typically with a cooperating witness, and you can ask all of those questions except make reference to the mandatory minimum, what makes that such a linchpin? Well, what makes it a linchpin is that if you analyze it that way, then Shannon would have no meaning because you can never ask it. You can always say, aren't you hoping for a 5k? Aren't you hoping for a better deal? For the jury to know that substantial assistance not only means a break, but it means coming off of a statutorily required minimum sentence of five years is extremely significant. The jury doesn't know that it starts out that high and that there's no way, you know, despite the U.S. Supreme Court's decisions on guidelines, nothing affects mandatories except coming off of it with a 5k or Rule 35. And it's extremely significant. The difference between five years and potentially probation or significantly less can only be driven home by the jury knowing how significant and how firmly entrenched this mandatory is. And the one and only way out, because this guy doesn't need the safety belt, he has plenty of priors, is the 5k. And to simply say you're hoping to do a little bit better doesn't let them know what he starts out with, nor does it let them know what he ends with. Can I say one thing about the second issue, the accomplice issue, if you may? There is no doubt that George Galey was an accomplice in this crime, none whatsoever. I point out all the different bases for it. He unloaded 200 pounds. He shipped money to his brother on this particular deal. He was present at the WIRED meeting. He was meeting with the guy who's the source of marijuana. There's no doubt he was selling marijuana. There's no doubt that he was an accomplice, both in the overall three deals and this particular deal. And the terrible prejudice that my client received when I requested an accomplice charge on both accomplices and got it only on one was that the jury said, okay, well, Robert Galey's an accomplice and we have to look at him with caution. But George Galey isn't. So when George Galey says Robert Galey's telling the truth, in essence, the court's imprimatur of credibility has been placed on him because the court says an accomplice is a guy who does this, Robert Galey is the accomplice, look at him with caution, and then he doesn't say it about George Galey. And while the court, I'm not conceding this, but while the court may have been able to get away with not giving an accomplice charge on either of these two guys and just letting me argue, once he gives it on one and doesn't give it on the other, the prejudice is evident. No matter what the government says, the fact is that the jury has heard that Robert's an accomplice and George isn't. All right, I think we understand your point. Thank you very much. I'll be back on the bottom. Mr. Eberhardt. Good morning. May it please the court, Robert Eberhardt, Assistant United States Attorney for the I will restrict myself to the issues that have been argued by Mr. Boas and like him, I rely on my brief on the other issues. Why don't you start in reverse order? Okay. Why wasn't, what Mr. Boas says about the absence of the accomplice charge, why doesn't that give George Galey extra credibility? Well, I think the reality of the page 940A of the appendix, the accomplice definition is given to the jury. And in reality, Mr. Boas was not inhibited in any way. In fact, he very actively argued that George Galey was an accomplice or an informant and he was a corrupt source. That appears at page 1011 and 1012 of the appendix. I think the reality is, is that George Galey's being a somewhat tainted witness in the view of the defense was very strongly presented to the jury. And the reality is, as the district court judge found, George Galey's participation in this current transaction of these almost 250 pounds of marijuana is not established anything more than he was a clerk who worked in Mr. Throckmorton's office and he handled paperwork. And there's nothing to indicate that he was either a participant in the purchase of the marijuana out in Arizona or that he did anything in particular with regard to unloading this particular shipment of marijuana. So in this particular episode of purchase of marijuana, George Galey is very, very tangentially involved. And that essentially is what the district court determined that his involvement is so minor. There's no establishment that he was an accomplice. I think Mr. Boas suggests quite a bit when he says neither one of these individuals could be an accomplice possibly. But I think very clearly the district court did not abuse its discretion in seeing the difference between George Galey as a clerk in Mr. Throckmorton's office and Mr. Robert Galey, who actively went out to Arizona, drove the truck, brought the marijuana back, parked it in the driveway, told Throckmorton it's here. Nothing like that is attributable to The district court did not prohibit Mr. Boas from arguing that George Galey was an accomplice and if not an accomplice, an informant who was a tainted source, a corrupt source. I think all that is clearly stated on the record. So I would suggest that under an abuse of discretion standard, the district court did not abuse its discretion in finding a distinction between Robert Galey and George Galey, but allowed the defense to argue that there was no real difference. I understand your decision to address what has been addressed, but help me a little bit because I'm more troubled by the O-sheet problem than some other things that have been discussed. My understanding is that there was in evidence an exhibit of an O-sheet that was taken from Mr. Thornton's premises. Right, it was part of the search. And the court ruled that he could not be asked whether this exhibit, whether he knew what this exhibit was and say that based on his experience that it is an O-sheet used by people who are involved in the drug business to record debts, et cetera, because he would be testifying as an expert and he had not provided a report prior to trial pursuant to the criminal rules. Well, now, if that's the case, how can the judge allow the witness to say, to be asked, do you know based on your experience what an O-sheet is? And he says, oh, yes. And he describes the O-sheet that is exactly by a description that exactly fits the exhibit that's in evidence. And he goes and then he says, well, do you know what this is? And he says, yeah, based on my experience, it's a sheet that's used by drug dealers in the course of their business to record their debts. Objection overruled. Well, if the witness couldn't say this exhibit is something that's used based on my experience, specialized experience, it was something that used by drug dealers, how can he give an exact description of the exhibit and then express the opinion based on his specialized knowledge that it was used in the drug dealing? It's an interesting record with regard to this issue and reviewing the record again last evening, it caught my eye that the first time the term O-sheet is used is used by Mr. Boas in his opening statement. And at page 363A of the appendix, after the government has made its statement in which it did not refer to O-sheet, Mr. Boas refers to an O-sheet. And it kind of struck me because it was later in the trial in which the issue of whether or not the state trooper would be allowed to testify with regard to his experience as an investigator, which was the basis of the questions that were asked of him. And the judge permitted, despite having ruled that a rule violation, which the court enforced through prohibiting the government from asking the state trooper, is this exhibit an O-sheet. The court prohibited that, but the court permitted the prosecutor to ask that witness, the trooper, in your experience as an investigator, is there such a thing as an O-sheet and what does it look like? So I think, again, it's an abuse of discretion issue. Did the court abuse its discretion in allowing the state trooper to testify in a limited fashion only as to what an O-sheet is, having, in my view, heard about an O-sheet in the opening statement of counsel for the defendant. And I think the trooper was only asked questions with regard to what an O-sheet is. And there was no... It was never offered in evidence, was it? There was no... I mean, it wasn't admitted in evidence, was it? It was not admitted in evidence. It was offered but not admitted. Right. So the jury didn't have it. Right. Oh, I'm sorry. I gave you the wrong hypothesis. It was a hypothetical I gave you, I guess. I thought that I thought that I realized that he was not permitted to say this sheet was used in the drug deal. But you're saying that there was nothing, there was no document admitted into evidence from Mr. Trogmorton's... I believe it was. I believe it was. But it was not identified by anybody as an O-sheet. So all the documents that were seized from... But Mr. Eberhardt, the document itself was offered and admitted and went to the jury. Whatever it was called, whatever it was identified, it was exhibit number, whatever. And it was what he had described, what the witness described as an O-sheet. Right. No witness during the trial. You have explained the problem very well, but I still haven't found my answer here. My argument on that is that the district court was making a decision based on enforcement of a discovery rule. There was a Rule 16 violation. A Rule 16 violation. And there was an argument from the prosecution that Rule 16 is not affected by the fact that there was no expert opinion provided to counsel. And that the prosecutor argued, I didn't really violate Rule 16 because under interpretations of Rule 702, I do not have to give a report on this type of opinion, this experience opinion. And the district court ruled contrary to that. In fact, the district court analyzed what its remedies possibly could be and concluded that the I will readily admit the prosecutor weaved his way through that problem and argued to the jury, at least I should be permitted to ask this witness what an O-sheet is. And I think it, to me, it's clear from the record that the word O-sheet has been used, that document is going to be seen by the jury, but at least I get the opportunity to say what it is. I think you better move on. You're going to run out of time here. With regard to the first issue, with regard to the lesser included offense, I would simply point out that there is nothing in the record about Mr. Gailey, Robert Gailey, going to get a split of this 233 pounds of marijuana. In fact, no matter how many times the defense points out page 909A of the record, 909A of the record reflects what I suggest and experienced judges I think would agree with me on this. What the district court judge was saying to the prosecutor was, be careful. Juries can be unreasonable. And they've heard this witness. In fact, I think I would agree with Mr. Boas. Robert Gailey was a difficult witness for both the prosecution and the defense. You could see the chip on his shoulder and you can see that he was difficult to get evidence and testimony from in the trial. But that being said, there's nothing that Robert Gailey said or any other witness said in this trial that would suggest there was going to be a split of the 233 pounds of marijuana. In fact, all the prior occasions of purchases of marijuana is financed by Throckmorton. He is the banker. He is the one who pays the source. He gets all of the marijuana. And what Robert Gailey testified to is that on one prior occasion, he had to pay Throckmorton, I think it was 13.50 a pound, for the marijuana he was going to sell. And if he sold it for more than that, he got to keep the profit. So it's clear from this record of even the prior occasions that this is Throckmorton's marijuana and he is going to sell possibly to Robert Gailey and that Robert Gailey would then possibly sell. So even the inference that Mr. Boas would like to draw, or like to have the jury draw, the only rational inference is that possibly Throckmorton is going to sell some of this to Robert Gailey at cost and that Robert Gailey can try to sell it at a profit. But it still remains Throckmorton's 233 pounds of marijuana. But no rational jury, I would suggest, would conclude that there is a split. There's nothing in the record that says there's going to be any kind of a split of this marijuana. It's all Throckmorton's marijuana and maybe, maybe by inference, Robert Gailey might get a chance to sell some of this marijuana on his own. Assuming, just assuming for the purpose of argument, that the court should conclude that there was error in limiting the cross-examination regarding exposure to punishment and the O'Sheet incident. Was it harmless error? I think it was absolutely harmless error to the greatest extent. And I say that because one, the question was asked. This is not a question of whether or not this question could be asked. The question was asked, first of all. And secondly, I think if you read the record, there's a back and forth that suggests maybe even the jury heard the question in regard to whether or not this should be heard or not. But the district court judge did not instruct the jury that they are to disregard the question and answer. This particular question was asked and the jury heard it. The jury heard an answer, a response, and there was no attempt to... What do you mean the jury heard a response? I know the question was asked. I believe that Gailey did say something. Now, whether he said no or whatever, I don't know. I don't recall. But I believe that he did respond. But whether or not he responded, the jury heard the question. And the only thing the jury heard was a mandatory minimum sentence. I don't believe Chandler is inappropriate to examine in this particular instance to either conclude that there was no error whatsoever or that an error, if there was one, was harmless. So the question was, you understand, sir, you've been told, have you not, that the quantity of drugs you were hauling would cause you to be incarcerated for a mandatory minimum of five years. That's what you're saying the jury heard? That's what the jury heard. Without being told to ignore the question... Without being told whether the answer to that question was yes or no, they heard the question. Well, they didn't hear whether or not Gailey knew that there was a five-year mandatory minimum. I know that, but they heard the question. They heard the question. And the reasonable inference I take it from that would be the jury knows that there's a five-year mandatory minimum for somebody in this courtroom. I thought I asked you to assume that the court concluded that there was error there as well as error in the O'Shee episode. And I asked you whether it was harmless error, assuming it was error. And it was clear to me from your response that you thought it was harmless error. But I didn't understand why you held that belief. And I thought it would be a good idea for you to tell us so that he could respond when he gets your friend across the way could respond when he gets up. Okay. With regard to this question, I think it's clearly in the context that it is harmless error. And the Chandler requirements of allowing Mr. Boas full range of cross-examination, but for that one area, Mr. Gailey was thoroughly cross-examined with regard to his knowledge of drugs and drug laws and his own jeopardy. Clearly there had not been a plea bargain entered into with Mr. Gailey at that point. And so his jeopardy was for the jury to assess on the basis that anything could happen to Mr. Gailey in this case. With regard to the O'Shee issue of whether that's harmless error, I would suggest that the O'Sheet on its face is something that jury could have inferred. This was a record of sales of marijuana. I think if you look at the document itself, the exhibit itself, I don't think you needed the trooper to say anything about it, but I think it was something that was maybe unnecessarily added to the, to the evidence. But I think in the, in the context of it's being introduced, the fact that Mr. Boas had referred to it in his, in his opening statement, I think it is harmless error on this record. Thank you. Thank you, Mr. Boas. May it please the court. First of all, getting to associate and one of the reasons it was so unsettling to me is that after the court ruled that you can't get into it because you didn't give an expert report, the U.S. attorney said, well, Gailey mentioned that he sold 10 pounds to his girlfriend, Kelly in Boston. And we found a piece of paper in Throckmorton's files that had the name Kelly on it. So we don't want to get it in for O'Shee purposes, but it shows he knows somebody named Kelly. And I argue, wait, he has a guy who works for him named Kelly. And the judge says, well, maybe it's the same Kelly. I'm going to let it in. So under the guise of bringing up this document to show he knows somebody named Kelly, first, he asked the officer to testify what's on the O'Sheet or what's on the paper. And as you pointed out, he says, it says Kelly, it says it mentioned four or five names. It has numbers after their names, first names, only the numbers. And then on the next page, he says, what's an O'Sheet. And I object to no he says, well, that's when they have first names only and then numbers and it goes in and it goes out with the jury. Now, let me interrupt. I'm sorry. Which exhibit is the O'Sheet? Which number is it? Yes. Or can you describe it for me? I'm looking at the list of exhibits and it's not clear to me which one is the O'Sheet. It's let's see if I can real quickly come up with the number. The list of exhibits is at 122 and 123 of the appendix. Well, it says Kelly. I'm a little confused by the exhibit list because it appears that the courtroom deputy checked the admitted box on everything listed herein, but then added parentheticals saying that several of these would not go out with the jury, which tells me that they, in fact, ultimately were not admitted. And the one, the ones that didn't go out were the ones other than the one that said Kelly on it. There was a number of pieces of paper that were the ones that the court, and initially he sustained the objection to the Kelly, to all of the O'Sheets. That's when Mr. Burke said, wait a minute, I don't want this Kelly page in as an O'Sheet, although that was belied by what he did a few minutes later. I want it in to show he knows somebody named Kelly because Robert Gailey said I was selling 10 pounds to Kelly and he knew that I was arguing that Gailey was selling stuff on his own. So if this shows that Throckmorton knows a person named Kelly, maybe the jury will think Gailey's selling it vis-a-vis Throckmorton. And then he gets into this thing about describing it in detail with other first names, figures afterwards, and then he says, what's an O'Sheet? Okay. You're running out of time. I get the feeling that this is kind of like the elephant in the room. So let me put it this way. Is this not a case where a man is driving a truck filled with a hell of a lot of marijuana. The truck breaks down. He is found out. He is arrested. He agrees to cooperate. He calls Throckmorton. He says, I've got your marijuana in a recorded phone call. I got your marijuana. The truck broke down, but I'm going to get it to you. Where should I take it? And Throckmorton says, take it to my house, etc. We seem to be debating a lot of small points here, but why is this not a case where the evidence of guilt of what he was convicted of was overwhelming and we're picking on little things that couldn't have had any effect? Because he never says, I got your marijuana. He never says anything about it. He says, hey, this damn truck is not worth anything. It keeps breaking down. That's why I'm late. It broke down and I had to wait a whole day to get it fixed. And Throckmorton says, just drop it off at my house. The equally logical inference is I'll take a look at it. And when they have this wired meeting, he doesn't say anything about the quantity or even mention the term marijuana. And that's in a meeting, not on the phone, where you're not worried about a wiretap. The point is, Your Honor, there wasn't overwhelming evidence of guilt. And after being out for hours and hours, the jury only convicted after they heard the tape again over my objection, where the speakers were labeled because Robert Gailey tells the agent who's speaking. And the judge said, I'm only letting in this transcript with the understanding that your witness identified who the speakers were. And then he let it in. And the witness never identified who the speakers were. And all the jury had was this transcript where Gailey had put in the names of who said what. And I objected again. And the court at that time, no one let it in, didn't even give a cautionary instruction when it went out during deliberations. So it wasn't a close case. The only evidence of Throckmorton's involvement was Robert and George Gailey saying he set them up. That was the only evidence. There was no drugs on him, no admissions of drugs. This is a very weak case other than their uncooperative testimony. I understand your position. Thank you very much. And the case is very well argued by both sides, and we will take the matter under advisement. Thank you very much. Thank you.